MBIA INSURANCE CORPORATION and Wells Fargo Bank Minnesota, N.A. as Trustee of SFC Grantor Trust, Series 2000–1, SFC Grantor Trust, Series 2000–2, SFC Grantor Trust, Series 2000–3, SFC Grantor Trust, Series 2000–4, SFC Grantor Trust, Series 2001–1, SFC Grantor Trust, Series 2001–2, SFC Grantor Trust, Series 2001–3, and SFC Grantor Trust Series 2001–I, Plaintiffs,

v.

ROYAL INDEMNITY COMPANY, Defendant.

No. CIV.A.02–1294–JJF.

United States District Court, D. Delaware.

Oct. 8, 2003.

David C. McBride, John W. Shaw, Christian Douglas Wright, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Proskauer Rose LLP, New York, New York (Ronald S. Rauchberg and Steven E. Obus, of counsel), for Plaintiffs.

Lawrence C. Ashby, Philip Trainer, Jr., Tiffany L Geyer, Ashby & Geddes, Wilmington, DE, Sonnenschein Nath & Rosenthal, New York, New York (Michael H. Barr and Kenneth J. Pfaehler, of counsel),

Alan S. Gilbert, Sonnenschein Nath & Rosenthal, Chicago, Illinois, for Defendant.

## MEMORANDUM OPINION

FARNAN, District Judge.

Currently pending before the Court is a Motion for Partial Summary Judgment filed by the Plaintiffs, Wells Fargo Minnesota, N.A. ("Wells Fargo") and MBIA Insurance Corporation ("MBIA") (D.I.12). For the reasons discussed below, the motion will be granted.

## I. Facts

This breach of contract case involves eight insurance policies issued by Defendant Royal Indemnity Company ("Royal") in connection with several thousand student loan transactions purchased by Student Finance Corporation ("SFC"). There is a great deal of background in this case, and therefore, I find it necessary to outline the background as it relates to the different parties and agreements in this case.

### A. SFC and Its Business

SFC was incorporated by Andrew N. Yao in 1992. (D.I. 47, Ex. 1 at 16). In the beginning of its corporate existence, SFC limited its activities to traditional lending arrangements, where it purchased bundles of pre-arranged student loans at a discount with funds that it borrowed from commercial banks and private investors. *Id.* Later, SFC sought to engage in larger transactions through "securitized" arrangements, where it could raise financing through the sale of asset-backed securities in the private securities markets. *Id.* As a result, SFC and its Affiliates sought to sell bonds or trust certificates backed by the payment obligations arising from the bundles of student loans that it purchased or originated. *Id.* at 16–17.

SFC would obtain credit risk insurance covering the underlying obligations to make the trust certificates more attractive to investors by providing additional security for payment. *Id.* at 17. SFC completed its first securitized transaction in 1996 by selling asset-backed certificates through an entity called SFC Grantor Trust. *Id.* These certificates were backed by a pool of approximately 1,056 loans to truck driving students that SFC or its Affiliates had acquired or made and a credit risk insurance policy issued by AIU Insurance Company. *Id.* The insured under the policy was an entity called SFC Acceptance LLC and the beneficiary was Bankers Trust Company, who was the trustee for the benefit of the certificate-holders. *Id.* Including this transaction, SFC or its Affiliates generated approximately 10,000 student loans from 1994 through 1998. *Id.* On average, these loans were for a term of 12.5 years, with relatively small principal amounts generally not exceeding a few thousand dollars, at an interest rate of 19–20%. *Id.*

### B. The Transactions at Issue

In 1998, SFC sought to expand its securitization program by persuading additional insurance companies to issue credit risk insurance policies in support of SFC sponsored transactions. *Id.* In furtherance of this plan, SFC arranged eight securitized transactions, which are the subject of the instant litigation. (D.I. 13 at 5).

This breach of contract case involves eight Credit Risk Insurance Policies issued by Defendant Royal in connection with several thousand student loan transactions purchased by SFC. In eight separate transactions, those loans were pooled and all right, title, and interest in the loans were transferred to Trusts of which Plaintiff Wells Fargo is the trustee. The Trusts then issued trust certificates or

floating-rate notes to investors, which entitled the investors to income streams from the underlying loans. The trustee, Wells Fargo, obtained eight Credit Risk Insurance Policies (the "Policies") securing the payment obligations on the underlying student loans. Specifically, the Policies insured the payment of principal and ninety days' interest in the event of defaults in the underlying student loans. Each of the Policies provides that a default occurs whenever a student loan is delinquent more than ninety days. (D.I. 13 at 6). As an additional layer of protection, MBIA issued to the Trusts separate financial guaranty insurance policies ("Guaranties") guaranteeing the Trusts' payment obligations on the Trust Certificates.

## C. The Relevant Provisions and Parties of the Credit Risk Insurance Policies

As noted previously, Royal as the insurer issued eight Credit Risk Insurance Policies in connection with several thousand student loan transactions purchased by

SFC, which list SFC Acceptance VI, LLC as the insured and Plaintiff, Wells Fargo as Beneficiary. (D.I.17, Ex. 5). Plaintiff MBIA contends that it is a third party beneficiary of the Policies, because in each transaction, the Royal Policy was transferred to the Trust as part of the Trust Estate "for the benefit of the Certificate holders and MBIA." (D.I. 18, Ex. 9 at § 2). Also, MBIA points out that each of the Policies specifically names MBIA, and provides that the Policy shall not be waived or modified unless consented to in writing by MBIA. (D.I. 17, Ex. 5 at § X; Exs. 6, 7 at § VIII).[1]

The relevant provisions of the first six Policies contain identical language. Specifically, the provision outlining Royal's obligation to pay claims under each of the first six Policies states:

*STUDENT LOANS*

The insurer's obligation to pay any claim made under this Policy is absolute, unconditional and irrevocable and shall not

---

1. I denied Royal's motion to dismiss in part because I concluded that MBIA possessed standing to sue. I believe further explanation is warranted concerning my view on MBIA's status in the context of this summary judgment motion. To qualify as a third party beneficiary of a contract under Delaware law, a party must demonstrate the following:

(a) the contracting parties must have intended that the third party beneficiary benefit from the contract, (b) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (c) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract. Thus, if it was not the promisee's intention to confer direct benefits upon a third party, but rather such third party happens to benefit from the performance of the promise either coincidentally or indirectly, then the third party will have no enforceable rights under the contract.

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269

F.3d 187, 196 (3d Cir.2001) (citing *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378, 1386 (Del.Sup.Ct.1990)) (internal citations omitted).

I conclude that MBIA is an intended third party beneficiary as evidenced by the facts that in each transaction, the Royal Policy was transferred to the Trust as part of the Trust Estate "for the benefit of the Certificate holders and MBIA" and that each of the Policies specifically names MBIA and provides that the Policy shall not be waived or modified unless consented to in writing by MBIA. (D.I. 17, Ex. 5 at § X; Exs. 6, 7 at § VIII); (D.I. 18, Ex. 9 at § 2). Thus, it is clear that the parties intended that MBIA benefit from the contract, because it was in satisfaction of a pre-existing obligation to MBIA, where MBIA issued to the Trusts separate financial guaranty insurance policies guaranteeing the Trusts' payment obligations on the trust certificates. Further, the intent to benefit MBIA was a material purpose in entering into the contract and intended to attract investors and provide an additional layer of protection.

in any way be affected, mitigated or eliminated by (y) a breach of any representation or warranty made by the insured, the Servicer, Student Finance Corporation or the Beneficiary, or (z) the failure of the Insured or Student Finance Corporation to comply with the Underwriting Policies.

D.I. 17, Ex. 5, at § IV.F.4. The same six Royal Policies also include a waiver of defense clause in Article XII, which provides in pertinent part:

Notwithstanding any other provision of this policy to the contrary, the right of the beneficiary to receive payment for loss under this policy after payment of the initial premium by the insured shall be absolute, irrevocable and unconditional, and no failure on the part of the insured, the servicer or the beneficiary to observe or perform any covenant or condition contained in this policy ... shall entitle the insurer to any right of set-off, counterclaim or defense against the beneficiary or any other parties or otherwise relieve the insurer of any liability to make any such payment for loss to the beneficiary under this policy, subject only to the limit of liability.

D.I. 17, Ex. 5 at § XII.

The above quoted language contained in §§ IV.F.4. and XII of the first six Policies does not mirror the language contained in the last two Policies. Rather, § XI of the last two Policies sets forth the right of the beneficiary to receive payment for losses under those particular Policies. Section XI of the last two Policies states in pertinent part:

Notwithstanding any other provision of this policy to the contrary, the right of the beneficiary to receive payment for losses under this policy shall be absolute, continuing, irrevocable and unconditional irrespective of (a) any fraud with respect to the student loans, (b) the genuineness, validity or enforceability of any insurance agreement, pooling agreement or student loan or the breach of any such contract or any covenant or representation or warranty made therein, or (c) any other rights or defenses that may be available to the insurer to avoid payment of its obligation under this policy(all of which rights and defenses are hereby expressly waived by the insurer) ....

Exs. 7, 8 at § XI.

### D. The Collapse of SFC

On March 20, 2002, SFC, which is now party to an involuntary bankruptcy proceeding in the United States Bankruptcy Court for the District of Delaware, disclosed that a significant number of the student loans it pooled and sold were in default.

On March 22, 2002, Royal received a telephone call from Mr. Yao, SFC's president and CEO, indicating that SFC had been making, but would no longer be able to make, the "forbearance" payments on the student loans. (D.I. 46 at 10). Mr. Yao explained that these payments were payments made on the loans by SFC, rather than the students as Royal had originally understood. *Id.* Subsequently, Royal, Wells Fargo and MBIA began to conduct an investigation into SFC's activities. *Id.*

Royal's investigation revealed that SFC had made forbearance payments to allegedly conceal student defaults of two million in 1999, $9.5 million in 2000, and $33 million in 2001. *Id.* Royal's investigation also revealed that the forbearance payments appear to have been funded with cash generated by originating larger amounts of new loans. *Id.* Further, Royal contends that its investigation revealed that removing the effects of the forbearance payments demonstrates that before Royal's insurance commitments, SFC's loan port-

folios across all programs were experiencing default rates of 25.9% in January 1999, 26.5% in December 1999, and 55.2% in June 2001. *Id.* at 11.

Royal also contends that it learned that there was a failure to implement SFC's underwriting criteria and acquired evidence of fraud by the truck driving schools. *Id.* Specifically, Royal contends that it obtained evidence that: 1) the schools promised students that their employer would pay the loan or that they did not have to pay if they did not get a truck driving job; 2) the schools issued student loans to students with criminal records or that were physically or mentally handicapped; and 3) that the loans contained signatures of school employees and false co-obligers. *Id.* at 11 n. 3.

Royal contends that although SFC's monthly servicer reports had indicated that the default rates were within the projected limits, this was because the defaults had been artificially depressed by the "Ponzi"[2] payment; in reality the SFC - related loans were experiencing defaults far in excess of the represented cumulative rate of 25%. *Id.* at 11. Further, Royal argues that the Ponzi scheme is further evidenced by the fact that before March 2002, all defaults in connection with all of the SFC programs amounted to approximately $38.6 million, well within the projected payments. *Id.* However, in December 2002, Royal was presented with actual claims in connection with the SFC programs of about $380 million, with a default rate of nearly 82%.

## E. The Complaint

As of May 31, 2002, 24,915 of the student loans pooled in the Trusts insured by the Royal Policies were in default. Accordingly, Wells Fargo, as trustee and as the named beneficiary of the Policies, filed a claim with Royal, dated June 21, 2002, in the amount of $137,653,434.00. On June 28, 2002, an additional 18,456 student loans were in default, and therefore, on June 28, 2002, Wells Fargo filed a second claim with Royal in the amount of $132,208,092.50. On July 23, 2002, Wells Fargo submitted a third claim for $20,410,364 and on August 20, 2002, submitted a fourth claim in the amount of $7,286,616.07.[3]

On July 15, 2002, Wells Fargo and MBIA filed the instant lawsuit against Royal. (D.I.1). Specifically, Wells Fargo,

2. The term "Ponzi scheme" was first coined by the United States Supreme Court in *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). Basically a Ponzi scheme begins with a promise of a high rate of return on an investment. But instead of paying the promised rate of return from legitimate legal business practices, the return is derived from the payments received from new investors. The momentum builds until the supply of new investors or investment funds fail to keep pace with the amounts owed to prior investors. *See* John Clemency, and Scott Goldberg, *On the Edge Ponzi Schemes and Claim Allowances*, Am. Bankr.Inst J. at *14 (November 2000) (defining Ponzi scheme).

As represented by Royal at the July 25, 2003 oral argument, the Ponzi scheme in this case allegedly involved SFC taking money from new student loans and using it to pay enough of the old student loans in order to mask the level of default. (Transcript of July 25, 2003 Argument ("Tr.") at 25).

3. At oral argument, the Plaintiffs informed the Court that they have filed new claims with Royal after August 20, 2002 which exceed the amount prayed for in their Opening Brief in support of their Motion for Partial Summary Judgment which was $269,851,526.50 that have not been paid, but indicated that they believe that the prayer for relief in the Complaint, seeking declaratory judgment that the Royal Policies are valid and enforceable and also its prayer for specific performance are sufficient to also recover those claims. (Tr. at 4).

as trustee, asserts claims against Royal for (1) specific performance of the Policies (Second Claim for Relief) and (2) anticipatory breach of contract (Fourth Claim for Relief). *Id.* at 18–21. Additionally, MBIA contends it is a third-party beneficiary of the Royal Policies and asserts claims against Royal for (1) specific performance of the Policies (First Claim for Relief), (2) anticipatory breach of contract (Third Claim for Relief), and (3) promissory estoppel (Fifth Claim for Relief). *Id.* at 17–21. Both Wells Fargo and MBIA also seek punitive damages for Royal's alleged willful breach of the Policies.

On March 31, 2003, I denied Royal's Motion to Dismiss or in the Alternative, for a Stay Pending the Disposition of a Prior Filed Action (D.I.5). (D.I.78). Subsequently, Plaintiffs Wells Fargo and MBIA filed the instant Motion for Partial Summary Judgment (D.I.12).

## II. The Parties' Contentions

Plaintiffs have submitted joint briefs in support of their Motion for Partial Summary Judgment. (D.I.13, 50). As a result, I will address their contentions collectively. Plaintiffs seek Partial Summary Judgment for: 1) a money judgment for the total amount of claims which Royal failed to pay when due in relation to the eight Policies; 2;) a declaratory judgment that Royal's claims against others provide no defense to payment to Wells Fargo and MBIA and that the Royal Policies are in full force and effect; and 3) an award of specific performance requiring Royal to pay additional sums as they become due.

First, Plaintiffs contend that summary judgment is appropriate here because the Royal Policies unambiguously provide an absolute and unconditional guaranty of payment to the trustee. (D.I. 13 at 11). In support of this contention, Plaintiffs point out that the interpretation of unam-

biguous contracts are resolvable as a matter of law, and are therefore, ripe cases for summary judgment. *Id.* Further, Plaintiffs contend that all of the Royal Policies contain an absolute and unconditional promise, in exchange for premiums paid to Royal, to pay the trustee the remaining receivable plus interest on defaulted loans, and therefore, at bottom Royal's Policies are suretyship contracts or guaranties. *Id.*

Also, Plaintiffs contend that there is no basis to postpone summary judgment in order to conduct discovery because any discovery would be irrelevant for several reasons. *Id.* at 13. First, Plaintiffs argue that under the basic principles of contract and suretyship law, Royal can have no valid defense to enforcement of its guaranty to the trustee based on alleged claims of fraud by others. Plaintiffs assert that this rule is based on the more general proposition, recognized in courts throughout the country, that where two innocent parties must suffer from the fraudulent acts of a third party, the loss must be borne by the party who through negligence or misplaced confidence enabled the third party to commit the fraud. *Id.* at 17. Second, Plaintiffs contend that under fundamental contract principles, Royal is precluded from rescinding the Policies on the grounds of fraud by others because Wells Fargo and MBIA changed their position in reliance on the Policies after Royal issued them and are innocent beneficiaries of the Policies. Specifically, Plaintiffs point out that Wells Fargo as trustee and Beneficiary of the Policies expresses the rights of the Certificate Holders, and the Certificate Holders did not extend credit in the eight transactions until after the guaranties by Royal were in place. *Id.* at 18. Further, Plaintiffs point out that MBIA did not issue its guaranties before the Royal Policies were in place. Based on this, Plain-

tiffs argue that Royal is precluded from rescinding the Policies.

Finally, Plaintiffs contend that Royal has expressly waived all defenses to payment to the Trustee as Beneficiary of the Policies. *Id.* at 19. Plaintiffs point out that in the first six Policies, in addition to its agreement to pay absolutely and unconditionally, Royal agreed that its payment guaranty to the trustee "shall not be affected, mitigated or eliminated by (y) a breach of representation or warranty made by the Insured, the Servicer, Student Financial Corporation or the Beneficiary, or (z) the failure of the Insured or [SFC] to comply with the Underwriting Policies." *Id.* at 19 (quoting D.I. 17, Ex. 5 at § IV.F.4.). The Plaintiffs contend that this language is sufficient to waive any defense that Royal might otherwise have against the Beneficiary for any fraudulent inducement by the insured (or their agents or confederates) relating to any breach of warranty or representation. (D.I. 13 at 19). Plaintiffs argue that it is extraordinary that Royal would agree in its Policies that misrepresentations by SFC are not a defense to payment and then assert SFC's alleged misrepresentation as an excuse not to pay. *Id.* To further bolster their position, the Plaintiffs also point to § XII of the first six Policies which provides that no failure on the part of the insured, the servicer or beneficiary to observe a covenant or condition will entitle the insurer (Royal) to a counterclaim or defense against the beneficiary or any other parties to make a claim payment under the Policies. *Id.* at 20.

Similarly, Plaintiffs argue that the last two Policies also contain waiver language, where the right of the beneficiary is "absolute, continuing, irrevocable and unconditional irrespective of (a) any fraud with respect to the Student Loans." *Id.* at 20 (quoting D.I. 17, Exs. 7, 8 at § 11). Fur-

ther, Plaintiffs point out that while these last two policies preserve Royal's right to bring claims against the insureds, they provide that no claims or rights will be a defense or a basis for limiting the payment to the Beneficiary. *Id.* at 20 (quoting D.I. 17, Exs. 7, 8 at § 11). Finally, Plaintiffs argue that Royal willingly surrendered its right to claim fraud against them in exchange for substantial premiums which as of July 20, 2002, already exceeded $28 million, and based on the unambiguous language of the Policies they are entitled to payment of their claims. *Id.* at 20–23.

In response, Royal argues that summary judgment is not appropriate at this time because there are genuine issues of material fact that require discovery. First, Royal contends that under the insurance contracts SFC's fraudulent misrepresentations are a basis for rescission. (D.I. 46 at 18). Second, Royal contends that as a general rule, one cannot obtain insurance for those losses which are not fortuitous, and therefore, the known loss doctrine precludes enforcement of the Policies. *Id.* at 20. Further, Royal contends that if and when the policies are rescinded, any rights of Wells Fargo and MBIA are cut off. *Id.* at 21. In addition, Royal contends that SFC's failure to apply underwriting policies is a failure to meet a condition precedent, which prevents the Policies from taking effect.

Royal argues that it has not waived any coverage defenses or fraud in the inducement under any of the Policy language. *Id.* at 32. Furthermore, Royal contends that the defense of fraudulent inducement is valid unless explicitly and specifically waived, and argues that none of the Policies contain such a waiver. (D.I. 60 at 1). Also, Royal contends that because it issued Credit Risk Insurance Policies—the fraudulent inducement by SFC make the policies voidable and the purported innocence

of Wells Fargo or MBIA (which has not been tested through discovery) is irrelevant. *Id.*

In reply, the Plaintiffs reiterate their argument that the clear and unambiguous language of all the Policies waived all defenses against the beneficiary specifically, the defense of fraud in the inducement. Further, Plaintiffs point out that the "known loss rule" could only prevent recovery by SFC and not the Plaintiffs, and that in any event, Royal has waived this defense. (D.I. 50 at 16–20).

## III. Applicable Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:

do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. Discussion

First, due to the voluminous briefing and several oral arguments on this motion, I will first list what I find the parties positions to be, based on the June 25, 2003, oral argument. MBIA and Wells Fargo, the Plaintiffs, argue that under the clear language of all eight Policies, they are entitled to payment of claims as Beneficiary and third party beneficiary because Royal has, as a matter of law, waived all defenses to payment. Further, the Plaintiffs argue that any discovery is unnecessary and summary judgment is appropriate at this time because there is no circumstance in which Royal can avoid its payment obligation.

Royal contends that summary judgment is inappropriate at this time, because the case law indicates that the language contained in the Policies is not sufficient to constitute a knowing and intelligent waiver of fraud in the inducement, where no waiver can be found unless the substance of the disclaimer provision tracks the substance of the alleged misrepresentation, and there is no such specificity in the eight policies at issue. Further, Royal argues that it did not waive the right to challenge the validity of the Policies themselves. As a result, Royal argues that discovery must be conducted regarding the fraud in the inducement and validity defenses.

As an initial matter, it is uncontested that Delaware law governs this matter. Further, despite Royal's contentions, Delaware law does not prohibit disclaimers of fraud claims. Although Delaware case law demonstrates a reluctance to honor such disclaimers where the parties are unsophisticated and where the disclaimers contain boilerplate and unbargained for language; Delaware courts have honored disclaimers of fraud, and specifically fraud in the inducement, where it has found sophisticated parties and negotiated disclaimer language. *Compare Norton v. Poplos*, 443 A.2d 1 (Del.1982) (finding that rescission of a real estate contract was not barred by a boilerplate clause which stated that title to the property in question is "subject to all existing encumbrances and restrictions of record."), *with Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555–56 (Del.Ch.2001) (finding a valid disclaimer of fraudulent inducement where highly sophisticated parties, "assisted by industry consultants and experienced legal counsel, entered into carefully negotiated disclaimer language after months of extensive due diligence" and where the parties explicitly allocated risks under a Purchase Agreement).

Also, I find that case law involving guaranties and sureties is directly on point with regard to this matter. Royal contends that guaranty and surety principles are "irrelevant to this action," because it issued credit risk insurance, not a guaranty. (D.I. 46 at 5). However, I find to the contrary for several reasons. First, in its Answer Brief, Royal defines the term guaranty as, "a collateral promise to answer for the payment of some debt or performance of some obligation by a specific third person on the default of that third person." (D.I. 46 at 16) (quotations omitted). I conclude that this is exactly how the Royal Policies operate. Specifically, each of the Policies contains a list of student loans in Schedule I. (D.I. 17, Exs. 5, 6 at 3, Exs. 7, 8 at 2). Also, each Policy defines a "Default" as ninety days delinquency on a student loan. (D.I. 17, Exs. 5, 6 at § II.E, Ex.7 at § II..F). Wells Fargo as beneficiary is entitled to claim any "Loss" from a Default and a Loss is defined as the "Value" of the Student Loan, which in turn is defined as the principal balance outstanding under the loan, plus accrued interest up to the Default Date. (D.I. 17, Exs. 5, 6 at §§ II.N, II.AA, Ex. 7, at §§ II.P, II.GG. Ex 8, at §§ II.R, II.JJ). In other words, the Policies provide that if a student defaults, Royal will pay the loans plus interest up until the time of default. Therefore, the Policies fall squarely within Royal's proffered definition of a guaranty.

Further, the language of the Policies also supports the conclusion that the Policies are guaranties, where the first six Policies define Royal's obligations as "absolute, continuing, irrevocable and unconditional." (D.I. 17, Exs. 5, 6 at §§ IV and XII) and the last two policies define Royal's obligation as "absolute, continuing, irrevocable, and unconditional" (D.I. 17, Exs. 7 and 8 at § XI). The case law and secondary sources also indicate that these are customary words used to make guaranties. *See, e.g., First Fed. Sav. Bank v. CPM Energy Sys. Corp.*, 1991 WL 35689, at *1–2 (Del.Super.Ct. March 12, 1991); *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985); 39 Corpus Juris Secondum ("C.J.S.") *Guaranty* § 9 (Interim Ed.2002).

Moreover, in my view, the fact that the Policies are labeled "credit risk insurance" does not negate the guaranty nature of the Policies, where "credit risk insurance" is often defined as a "financial guaranty." *See, e.g.,* Rupp's Insurance & Risk Management Glossary (1996); *see also Seattle*

*First Nat'l Bank v. Wash. Ins. Guar. Ass'n,* 116 Wash.2d 398, 804 P.2d 1263, 1266 (1991) (stating that "[c]redit risk insurance is a form of surety insurance.") Also, commentators have recognized that "financial risk insurance" includes "both guaranties that are written, insurance policies, and those that are surety bonds," and have also pointed out that "[s]ince both insurance and surety can accomplish the same thing, it is not usually important which form the guaranty takes." Beverly B. Wadsworth, *Financial Risk Insurance: A New Concept?*, Suretyscope, Winter 1986, at 13–14 (1986). Suretyship is also recognized as a class of insurance under Delaware law. *See* 18 *Del. C.* § 102 (including in the definition of insurance the undertaking "to act as a surety.") Further, some courts have recognized that parties may opt to provide a guaranty in the form of an insurance policy. *See, e.g., Chase Manhattan Bank v. New Hampshire Ins. Co.*, 193 Misc.2d 580, 749 N.Y.S.2d 632, 643 (N.Y.Sup.2002). Therefore, I conclude that cases dealing with guaranties and sureties are relevant to the instant matter and with this backdrop, I will examine some of the cases relied upon by the parties in this matter.[4]

The parties have not presented, nor have I found, any Delaware cases that present similar factual circumstances and issues, and therefore, I will look to other jurisdictions for guidance. I find two cases particularly persuasive as to the issues presented here. *See Valley Nat'l Bank v. Greenwich Ins. Co.*, 254 F.Supp.2d 448 (S.D.N.Y.2003); *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (N.Y.1985).[5] The *Plapinger* case involved a guarantee which provided that the Defendant's obligation to pay was "absolute and unconditional" regardless of "(i) any lack of validity... of the ... Restated Loan Agreement ... or any other agreement or instrument relating thereto, or (vii) any other circumstance which might otherwise constitute a defense to the guarantee." *Id.* at 95, 495 N.Y.S.2d 309, 485 N.E.2d 974. The court upheld this waiver and declined to recognize equitable defenses, including fraudulent inducement, in part because the guaranty was not a boilerplate clause, but instead a multimillion dollar guaranty that was heavily negotiated between sophisticated business parties. *See id.* The court concluded "that the language of disclaimer in the guarant[y] is sufficiently specific to foreclose as a matter of law the defenses and counterclaims based on fraud, negligence or failure to perform a condition precedent asserted against plaintiff banks". *Id.* at 93, 495 N.Y.S.2d 309, 485 N.E.2d 974.

The *Valley Nat'l* case involved a Premium Finance Agreement ("PFA") between Valley and National. *Id.* at 451. Under the PFA, Valley agreed to advance $7,500,000 (the "Funds") to National, which sought to use the Funds to finance

---

**4.** I also note that many of the cases relied upon by Royal in oral argument on June 25, 2003, involved guaranty and surety agreements. *See, e.g., JPMorgan Chase Bank v. Liberty Mutual Ins. Co.*, 189 F.Supp.2d 24 (S.D.N.Y.2002); *Manufacturers Hanover Trust v. Yanakas*, 7 F.3d 310 (2d Cir.1993).

**5.** Although *Plapinger* is a New York case, Delaware courts have relied on this case when conducting an analysis on waiver of defenses or counterclaims. *See, e.g., Relational Fund-*

*ing Corp. v. TCIM Services, Inc.*, 2003 WL 360255, 2003 U.S. Dist. Lexis 2370 (D.Del. February 14, 2003) (citing *Plapinger* in holding that counterclaims are barred by specific language of a Lease); *In re IBP, Inc. Shareholders Litig. v. Tyson Foods, Inc.*, 789 A.2d 14, 62 (Del.Ch.2001) (citing *Plapinger* for the proposition that contractual agreement that representations outside of contract were not relied upon prevented a fraud in the inducement claim).

premiums on National's insurance policy with Twin Oaks Insurance Company, Ltd. ("Twin Oaks"). Also, pursuant to a Loan and Security Agreement and a Term Note between Valley and National, National was scheduled to repay the funds in eight installments. *Id.* In order to ensure against the risk that National might default, Valley received contractual guaranties from National and required National to obtain a premium finance bond from Greenwich Insurance and Reinsurance America, which guaranteed payment of the obligations owed by National to Valley in the event of any default by National. *Id.*

The Disclaimer clause in the Bond Stated:

> The Surety's liability under this bond shall not be released, discharged or affected in any way (except as expressly provided in this bond) by any circumstances or condition (whether or not [Defendants] shall have knowledge thereof), including, without limitation: (a) the attempt or the absence of any attempt by [Valley] to obtain payment or performance by [National] or any other surety or guarantor of the [insurance premium payments]; ... and (c) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of [Defendants], except as provided under this bond. [Defendants] hereby expressly waives and surrenders any defense to its liability under this bond based upon any of the foregoing acts, omissions, agreements, waivers or matters. It is the purpose and intent of this bond that the obligations of [Defendants] hereunder shall be absolute and unconditional under any and all circumstances, except to the extent provided in this bond.

*Id.* at 457 (quotation omitted).

National missed the second of eight installment payments and two weeks following the missed payment, Valley notified National that it was in default and demanded payment of the remaining amount due under the Loan agreement and Term Note. *Id.* Simultaneously, Valley notified Greenwich Insurance and Reinsurance America that it was asserting a claim under the Bond for payment of the remaining amount, under the terms of the Bond which stated that their obligation to pay was immediate and unconditional. *Id.* at 451–452. In response, Greenwich Insurance and Reinsurance America alleged that unbeknownst to them, at the time they issued the Bond, Valley was either involved in, or aware of a fraudulent scheme where Valley and other parties disguised simple loans as premium finance arrangements, and then negotiated bonds to guarantee these arrangements. *Id.* Greenwich Insurance and Reinsurance America contended that they would not have issued the Bond if they were aware of the true nature of the transactions and alleged that Valley fraudulently induced it to issue the bonds, and asked for further discovery in order to mount a defense based on this allegation. *Id.*

In considering Valley's motion for summary judgment, the court set out the standard for summary judgment when considering an obligor's responsibility for payment of a guaranty where it explained:

> Valley must demonstrate that the Bond was executed by National and the Defendants, and the Defendants did not fulfill their payment obligations, in order to establish a prima facie entitlement to summary judgment. Once a prima facie entitlement has been established, the plaintiff is entitled to summary judgment unless the defendant can assert defenses that would raise a genuine issue of material fact.

*Id.* at 454. The court then went on to distinguish its case from several cases re-

lied upon by the defendants and granted summary judgment in favor of Valley, finding that under the negotiated Bond, Greenwich Insurance and Reinsurance America had an absolute obligation to pay and had waived any defense of fraud, and therefore, there were no genuine issues of material fact. *Id.* at 463. In granting summary judgment in favor of National, the court noted the importance of several factors. First, the court noted that the Bond was a product of negotiations and was not a preprinted form as in the *Manufacturers Hanover Trust v. Yanakas,* 7 F.3d 310 (2d Cir.1993). *Id.* at 458. Second, the court pointed out that the Defendants themselves, in addition to being experienced in sureties, drafted the terms at issue in the Bond. *Id.* at 458. Further, the court noted in regard to the issue of specificity of the disclaimer, that it is "less applicable in this situation where the drafter and more sophisticated party in the transaction now claims that the disclaimer is too broad and not specific enough." *Id.* The court in the *Valley Nat'l* case also went on to distinguish *JPMorgan Chase Bank v. Liberty Mutual Ins. Co.,* 189 F.Supp.2d 24 (S.D.N.Y.2002), where it found that it was readily distinguishable because it "involved an unusual case of fraud at the extreme, embodied in the deceptive business practices of the now defunct Enron." *Id.* at 459–460.

Similarly, in the case at bar, the Policies at issue were the product of negotiation. Further, I understand that Royal is an experienced, sophisticated party in the business of issuing "Credit Risk Insurance." Although Royal contends that SFC drafted the Policies at issue, the Plaintiffs, Wells Fargo and MBIA had no part in the drafting of these provisions, and the provisions at issue were obviously a product of negotiation between Royal and SFC which took place over a long period of time.

Further, I find that the cases relied upon by Royal are inapposite to the instant situation. For example, the defendant in *Yanakas,* who was contesting a disclaimer, was presented with boilerplate language on a preprinted form drafted by the bank and the court found that no negotiations took place over the language at issue. *Yanakas,* 7 F.3d at 317. On the other hand, in this case, we are dealing with Royal's own policies insuring SFC, which were negotiated. Further, Royal relies heavily on the *JPMorgan* case to support its contention that it has not waived the defense of fraud in the inducement.[6] However, like the court in *Valley Nat'l,* I find that the *JPMorgan* case was an unusual and extreme case, and therefore, provides little guidance as to the issues before me. In *JPMorgan,* the sureties were led to believe that they were insuring the sale of assets, which were the delivery by Enron of gas and oil. However, it was a scheme where Enron sold gas and oil to Mahonia for a lump sum single payment, then it repurchased the gas and oil from another company which had the same directors and shareholders as Mahonia, for a larger sum that was paid over time. This scheme resulted in a simple loan from JP Morgan to Enron, but was held out to be a sale of assets so that Enron could induce the sureties to issue bonds that guaranteed that the loans would be repaid, which the

6. Royal contends that the disclaimer language in the Policies at issue does not meet the standard of specificity as set out by the court in *JPMorgan.* *See, e.g., JPMorgan Chase Bank v. Liberty Mutual Ins. Co.,* 189 F.Supp.2d 24, 27 (S.D.N.Y.2002) (stating "[t]he mere general recitation that a guarantee is 'absolute and unconditional' is insufficient ... to bar a defense of fraudulent inducement ...." Rather, "the touchstone is specificity," that is a clear indication that the disclaiming party has "knowingly disclaimed reliance on the specific representations ....").

sureties would not have been able to do under New York law.

■ Unlike the facts here, the *JPMorgan* case involved a situation where the whole transaction at the center of the dispute was a sham involving loan transactions being represented as pure loans. Additionally, although Royal seeks further discovery as to MBIA's and Wells Fargo's role in SFC's alleged fraud, as compared to the Defendants in the *JPMorgan* case, Royal has not come forward with any evidence to implicate MBIA and Wells Fargo in any alleged fraud. However, even if they had, I find that evidence of fraud would be irrelevant to my analysis because under the express terms of the Policies negotiated by Royalit waived any such a defense. Therefore, I find there are no genuine issues of material fact and discovery as to Royal's proffered defenses is unwarranted.[7]

I conclude that the most persuasive evidence of Royal's express waiver of a fraud in the inducement or invalidity defense against Wells Fargo and MBIA is the pure unambiguous language of the Policies themselves. Specifically, the first six policies stated:

*STUDENT LOANS*

The insurer's obligation to pay any claim made under this Policy is *absolute, unconditional and irrevocable* and shall not in any way be affected, mitigated or eliminated by (y) a *breach of any representation or warranty made by the insured*, the Servicer, Student Finance Corporation or the Beneficiary, or (z) the failure of the Insured or Student Finance Corporation to comply with the Underwriting Policies.

D.I. 17, Ex. 5, at § IV.F.4 (emphasis added). The same six Royal Policies also include a waiver of defense clause in Article XII, which provides in pertinent part:

Notwithstanding any other provision of this policy to the contrary, the right of the beneficiary to receive payment for loss under this policy after payment of the initial premium by the insured *shall be absolute, irrevocable and unconditional, and no failure on the part of the insured,* the servicer or the beneficiary *to observe or perform any covenant or condition contained in this policy* ... *shall entitle the insurer to any* right of set-off, counterclaim or *defense against the beneficiary* or any other parties or otherwise relieve the insurer of any liability to make any such payment for loss to the beneficiary under this policy, subject only to the limit of liability.

D.I. 17, Ex. 5 at § XII (emphasis added). The language of this provision is clear; the beneficiaries' right to payment is "absolute irrevocable and unconditional" irrespective of the failure of SFC, the insured, to perform any covenant or condition, and no such failure will entitle Royal to *any defense,* including fraud in the inducement or invalidity of the Policy, against the beneficiaries.

Further, the last two Policies state:

Notwithstanding any other provision of this policy to the contrary, *the right of the beneficiary to receive payment for losses under this policy shall be absolute, continuing, irrevocable and unconditional irrespective of (a) any fraud with respect to the student loans, (b) the genuineness, validity or enforceability*

---

7. *See, e.g., Valley Nat'l,* 254 F.Supp.2d 448, 463 (denying request for further discovery on the issue of plaintiff's role in fraud in the inducement under Civil Rule of Procedure 56(f) because the Court declined to "engage in a lengthy inquiry based on mere speculation" and found that the Defendants waived all defenses including fraud in the disclaimer clause of the Bond.)

*of any insurance agreement,* pooling agreement or student loan or the breach of any such contract or any covenant or representation or warranty made therein, or (c) any other rights or defenses that may be available to the insurer to avoid payment of its obligation under this policy(all of which rights and defenses are hereby expressly waived by the insurer) . . . .

Exs. 7, 8 at § XI (emphasis added). This Policy language clearly sets forth that Royal's obligation to pay is "absolute, continuing, irrevocable and unconditional" irrespective of *any fraud* in relation to the student loans or the validity of the insurance agreements and *any other defenses* that may be available to Royal to avoid payment. Although at oral argument Royal contended that this language did not rise to the level of the "touchstone of specificity" that Royal contends is required, where the disclaimer has to track the substance of the misrepresentation, I do not find that sophisticated parties are required to provide a laundry list of specific situations where defenses are waived when the negotiated language clearly states that *any* defenses are waived. *See, e.g., Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (affirming strike of fraud counterclaim where the guaranty, directing defendants obligations to pay stated that its "absolute and unconditional" nature was "irrespective of (i) any lack of validity . . . of the . . . Restated Loan Agreement . . . or any other agreement or instrument relating thereto, or (vii) any other circumstance which might otherwise constitute a defense to the guarantee."); *Valley Nat'l,* 254 F.Supp.2d at 463 (granting summary judgment in favor of plaintiff and denying defendant's request for discovery where surety bond described the defendant's obligation as "absolute and unconditional under any and all circumstances, except to the extent provided in this bond."). Additionally, I find it significant that the Plaintiffs are neither the insured nor the insurer under any of the Policies, and therefore, took no part in the drafting or negotiation of any of the provisions at issue.

In sum, I am persuaded that Plaintiffs have satisfied their burden for summary judgment, and demonstrated that Royal has waived all defenses in the above-quoted disclaimer clauses of the Policies that it negotiated. Royal has failed to demonstrate that there are any genuine issues of material fact because Royal has an unconditional obligation to pay MBIA and Wells Fargo their claims for the defaulted loans, regardless of any fraud in the inducement or validity defenses.

Accordingly, I conclude that the Plaintiffs' claims are premised on the unambiguous Policy language and Plaintiffs are entitled to payment pursuant to the eight Policies.

An appropriate Order has been entered.